IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

FILED
September 4, 2024
ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

OSEI ASSIBEY BONSU,
Respondent Below, Petitioner

v.) No. 23-ICA-326          (W. Va. Bd. of Registered Nurses, Case No. 104449)

WEST VIRGINIA BOARD OF REGISTERED NURSES,
Complainant Below, Respondent

**MEMORANDUM DECISION**

Petitioner Osei Assibey Bonsu appeals the July 7, 2023, final order of the West Virginia Board of Registered Nurses ("Board"), which found that he had fraudulently obtained his nursing license by purchasing his degree and revoked his nursing license. The Board filed a summary response.[1] Mr. Bonsu did not file a reply. The main issue is whether the Board, by solely relying on documents submitted by the Federal Bureau of Investigation ("FBI"), met its burden of proof.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2022). After considering the parties' arguments, the record on appeal, and the applicable law, this Court finds that there is error in the Board's decision but no substantial question of law. This case satisfies the "limited circumstances" requirement of Rule 21(d) of the Rules of Appellate Procedure for reversal in a memorandum decision. For the reasons set forth below, the Board's decision is affirmed, in part, and reversed, in part.

Mr. Bonsu, who is West African, came to the United States in 2004. In 2019, he received his Associate Degree in Nursing ("ADN") from Palm Beach School of Nursing, passed the National Council Licensure Examination for Registered Nurses ("NCLEX") on January 20, 2021, was issued a West Virginia Registered Nursing ("RN") License on January 22, 2021, and was issued a multi-state RN license on February 3, 2021.

On July 21, 2021, the FBI sent a letter to the National Council of State Boards of Nursing ("NCSBN") informing it of an ongoing investigation related to certain nursing programs, which included the then-accredited Palm Beach School of Nursing. The FBI suspected that these certain nursing programs were offering counterfeit transcripts and nursing degrees in exchange for money. The FBI stated that numerous students who had

---

[1] Mr. Bonsu is represented by Todd W. Reed, Esq. The Board is represented by Patrick Morrisey, Esq., and Joanne M. Vella, Esq.

1

purchased their degrees from these certain nursing programs were able to pass the NCLEX and were currently practicing health care professionals. The FBI cautioned nursing boards not to assume that every graduate from one of these certain nursing programs had purchased their degree or lacked the necessary education credentials, and encouraged the boards to conduct their own more thorough investigation to determine if licensees who graduated from any of these certain nursing programs appeared to have the skills and knowledge needed to perform their duties, and to assess if any of them had disciplinary measures or poor evaluations based on insufficient skill sets. The NCSBN then notified the Board by letter dated July 30, 2021, and attached the FBI's letter.

On February 7, 2022, the NCSBN sent a letter updating the Board that the FBI had requested additional data from the NCSBN. This letter reiterated that the FBI again cautioned the boards not to assume that every graduate of the affected nursing programs had purchased their degree or lacked the necessary credentials.

On June 15, 2022, the FBI sent another letter to the NCSBN. This letter confirmed that Palm Beach School of Nursing was one of five affected nursing programs that had been issuing illegitimate nursing degrees, diplomas, and transcripts. The FBI attached a signed affidavit of Johanah Napoleon, dated June 7, 2022. Ms. Napoleon was the owner and operator of Palm Beach School of Nursing and three of the other identified schools. In her affidavit, Ms. Napoleon identified certain individuals who had obtained legitimate degrees, diplomas, and transcripts, and certain individuals who had obtained illegitimate degrees, diplomas, and transcripts.[2] Her affidavit stated, in relevant part, the following:

> From in or around October 2016 to in or around December 2020, [the four schools] issued transcripts and diplomas to 62 individuals listed in Attachment A, who completed the required program hours and clinical training necessary to receive either a practical nursing diploma and transcript or a nursing associate in science degree and transcript. From in or around October 2016 to present, [the four schools] issued transcripts and diplomas to 4989 individuals listed in Attachment B, who did not complete the required program hours and clinical training necessary to obtain either a practical nursing diploma and transcript or a nursing associate in science degree and transcript. . . . I am also aware there may be other individuals claiming to have completed the registered nursing program at . . . Palm Beach School of Nursing who may possess illegitimate degrees and transcripts. However, those individuals not named in Attachment A are not known to me to have completed the required program hours and clinical training necessary to earn a nursing associate in science degree and transcript.

_____

[2] Ms. Napoleon pled guilty to conspiracy to commit healthcare fraud and wire fraud on November 21, 2022.

The FBI again encouraged the boards to use the information to conduct their own investigations to determine what actions to pursue against individuals with illegitimate degrees that could be licensed or seeking licensure. The record below indicates that only Ms. Napoleon's affidavit, along with two other pages, were provided to the Board. The first of these two pages simply says "Attachment B" with the entire page blacked out and the second page contains only the name, date of birth, and social security number of Mr. Bonsu, with the remainder of the page blacked out. The record indicates that "Attachment A" was neither submitted to the Board nor to this Court.

Based upon this information, the Board found that Mr. Bonsu's continuation of nursing placed "the health, safety and welfare of the public is at risk" pursuant to West Virginia Code § 30-1-8(e)(1) (2005) and summarily suspended Mr. Bonsu's RN license on January 27, 2023. In its complaint, the Board specifically alleged that Mr. Bonsu violated West Virginia Codes §§ 30-7-11(a)(1) (2018), 30-7-11(a)(3), and 30-7-11(a)(7), which state:

> (a) The board shall have the power to deny, revoke, or suspend any license to practice registered professional nursing issued or applied for in accordance with the provisions of this article, or to otherwise discipline a licensee or applicant upon proof that he or she:
> (1) Is or was guilty of fraud or deceit in procuring or attempting to procure a license to practice registered professional nursing; or
> (3) Is unfit or incompetent by reason of negligence, habits, or other causes; or
> (7) Is practicing or attempting to practice registered professional nursing without a license or reregistration[.]

The Board also alleged that Mr. Bonsu violated the West Virginia Code of State Rules §§ 19-3-14.1.e., 19-3-14.1.o, 19-3-14.1.t., 19-3-14.1.jj., and 19-3-14.1.tt. [sic],[3] which states the following:

> Conduct, including, but not limited to the following, if proven by a preponderance of evidence, constitutes professional misconduct subject to disciplinary action pursuant to W. Va. Code § 30-7-11(a)(6). The applicant or licensee:
> 12.1.e. practiced or offered to practice beyond the scope permitted by law or accepted and performed professional responsibilities that the licensee knows

---

[3] The correct statutes at the time the Board issued its complaint were subsections 12.1.e., 12.1.o., 12.1.t., 12.1.jj., and 12.1.tt. of the West Virginia Code of State Rules §§ 19-3-12.1 (2022).

or has reason to know that he or she is not licensed, qualified, or competent to perform;

12.1.o. engaged in dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public or any member of the public; thus, not exercising good professional character;

12.1.t. knowingly provided false information regarding completion of educational programs;

12.1.jj. provided false information on any application, or any other document submitted to the board for the purpose of licensure, advance practice recognition, or prescriptive authority;

12.1.tt. practiced registered professional nursing by way of telecommunications or otherwise, in any other state, territory, jurisdiction, or foreign nation, without a license to do so and not in accordance with the law of that state, territory jurisdiction, or foreign nation[.]

On February 15, 2023, the Board held a disciplinary hearing. The Board's witnesses were Michael Payne, general counsel for the Board, and Dr. Sue Painter, executive director for the Board. Mr. Payne and Dr. Painter testified that neither of them performed an independent investigation into Mr. Bonsu's case, that they were not aware of the Board conducting an independent investigation of the allegations against Mr. Bonsu, and that their knowledge of the matter was based solely on the FBI's investigation, which included Ms. Napoleon's affidavit. Mr. Payne's testimony revealed that he determined Mr. Bonsu committed fraud only by relying on Ms. "Napoleon's word" because "[s]he swore to it in court. . . [s]he provided an affidavit. . . and [s]he was investigated by the FBI." He further testified that the fraudulent scheme consisted of individuals, listed in Attachment B of the Napoleon Affidavit, who paid for their transcript and diploma without attending any programs or clinical training necessary to earn an ADN while Attachment A of the Napoleon Affidavit, which was not submitted to the Board, contained a list of individuals who legitimately earned their degrees by attending the programs and clinical trainings. Thus, Mr. Payne testified that the fraudulent scheme was simply Ms. Napoleon providing fake transcripts and diplomas to individuals in exchange for money. Dr. Painter also testified to a similar understanding of the scheme and the allegations against Mr. Bonsu. The Board then rested, and Mr. Bonsu testified in his defense.

Mr. Bonsu testified that he went to school at Radians College in Washington, D.C. in 2015 for approximately eighteen months, where he became a Licensed Practical Nurse ("LPN"). As an LPN, he worked mostly in nursing homes in and around Maryland, Virginia, and West Virginia. In 2016, he worked at Willowtree in Charles Town, West Virginia and in 2017, he began working at Reeders Nursing Home in Boonesboro, Maryland. He testified that he was often promoted to higher positions and his colleagues persuaded him into pursing an ADN so that he could be an RN. Mr. Bonsu further testified that in 2018, he began working at General Healthcare, an agency that offered flexible hours to healthcare workers in various West Virginia and Maryland facilities, so that he could

4

pursue his ADN while continuing to work as an LPN. In early 2019, he began attending Siena College of Health in Florida, enrolling in its fast-paced "bridge" program, which allowed him to achieve his ADN to become an RN in six months. His testimony revealed that he began attending Siena College of Health in mid-January 2019; the January classes were part of an initiation program with actual classes beginning in February. While at Siena College of Health, he stated that his clinicals began every Monday at 6:00 a.m. while other courses were taught every Tuesday through Friday from 9:00 a.m. to 5:00 p.m. Mr. Bonsu testified to the courses he completed and identified three of his professors' names. He introduced bank statements from January 2019 through April 2019 that showed transactions he made in Florida, including one to Siena College of Health on March 28, 2019. Mr. Bonsu also submitted some hand-written tuition receipts. He testified that in June 2019, Siena College of Health transferred him to Palm Beach School of Nursing for the month of June 2019 because Siena College of Health was closing. Mr. Bonsu stated that he was only physically present for the first week of school at Palm Beach School of Nursing with the remainder of the courses being taught online.

Regarding clinicals at Palm Beach School of Nursing, Mr. Bonsu testified that he was given clinical credit for his time spent working as an LPN in Maryland. Specifically, he stated that the school communicated with his place of employment to credit him proper clinical hours by obtaining the name of the facility, the facility's director of nursing, and other information. Mr. Bonsu acknowledged that his transcript incorrectly stated that he attended Palm Beach School of Nursing from April 3, 2017, to June 28, 2019, but stated that his transcript was sealed when he submitted it for the NCLEX and he had not read the dates reflected until the commencement of these disciplinary proceedings.[4] He acknowledged that it took him three attempts to pass the NCLEX. Mr. Bonsu further testified that he had never been disciplined or terminated when he was working as an LPN or RN, and no evidence was submitted in contradiction to this assertion.

On May 22, 2023, the hearing examiner filed her written recommendation with the Board, which included findings of fact and conclusions of law. Among them, the hearing examiner found that the testimony of Mr. Payne and Dr. Painter was credible, consistent, and supported by documentary evidence. Mr. Bonsu's testimony was determined to be self-serving and not credible because it was unclear, inconsistent, and not supported by his documents.

The hearing examiner found that the evidence established that Mr. Bonsu obtained his RN license by fraudulently obtaining his ADN, falsely completing his application to the Board, and that he knew or should have had reason to know that he was practicing professional nursing without a valid license. The hearing examiner further found that the

_____

[4] The two individuals who signed the transcript, Cheryl Stanley and Gail Russ, were indicted in January 2023.

documentary evidence Mr. Bonsu submitted failed to prove that he was making actual tuition payments instead of making payments for a fraudulent transcript, that Mr. Bonsu acknowledged that the transcript he submitted in his application to the Board contained the incorrect attendance start date, and that he "did not identify any time in pediatrics, maternal and newborn health, or medical/surgical units, even though those classes were listed on his transcript and are required courses of study." Thus, the hearing examiner determined that Mr. Bonsu had not completed the necessary requirements to obtain an ADN.

Ultimately, the hearing examiner concluded that the Board had proven the allegations contained in the complaint and summary suspension order by a preponderance of the evidence through testimony and documentation and that Mr. Bonsu's RN license should be revoked. Specifically, the hearing examiner found that the Board had proven that Mr. Bonsu violated West Virginia Code §§ 30-7-11(a)(1), 30-7-11(a)(3), and 30-7-11(a)(7). The hearing examiner also found that the Board had proven its allegation that Mr. Bonsu violated the various provisions of West Virginia Code of State Rules § 19-3-12.1 (2022).[5] Namely, it was determined that Mr. Bonsu had "performed professional responsibilities" that he "[knew] or ha[d] reason to know that he . . . . [was] not licensed, qualified, or competent to perform[.]" W. Va Code R. § 19-3-12.1.e; "engaged in dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public or any member of the public[.]" W. Va Code R. § 19-3-12.1.o; "knowingly provided false information regarding [his] completion of [his] educational program[.]" W. Va. Code R. § 19-3-12.1.t; and "provided false information on any application, or any other document submitted to the [B]oard for the purpose of licensure, advance practice recognition, or prescriptive authority[.]" W. Va. Code R. § 19-3-12.1.jj.[6]

On July 7, 2023, the Board issued its final order. The Board adopted the hearing examiner's recommended findings of fact and conclusions of law, verbatim, included additional terms and conditions, and revoked Mr. Bonsu's RN license. It is from this final order that Mr. Bonsu now appeals.

Our review of this matter is governed by the State Administrative Procedures Act, and it provides:

---

[5] In the final order, the hearing examiner and the Board incorrectly cited older versions of the West Virginia Code of State Rules. Nonetheless, the language remains the same for the version applicable to this appeal. *See* W. Va. Code R. § 19-3-12.1.

[6] The hearing examiner did not find evidence that Mr. Bonsu "practiced registered professional nursing by way of telecommunication . . . ." pursuant to West Virginia Code of State Rules § 19-3-12.1.tt, as alleged in the Board's complaint.

The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate, or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decision, or order are:

(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority or jurisdiction of the agency;
(3) Made upon unlawful procedures;
(4) Affected by other error of law;
(5) Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or
(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

W. Va. Code § 29A-5-4(g) (2021).

On appeal, Mr. Bonsu asserts one assignment of error. He argues that the Board erroneously determined that he practiced professional nursing without a valid license because he fraudulently purchased his transcripts and submitted fraudulent applications, and thus knew or had reason to know that he had not completed the necessary prerequisites to become an RN. In support of his argument, Mr. Bonsu contends that the Board acknowledged that it conducted no independent investigation and relied solely on the FBI's production of convicted felon, Ms. Napoleon's affidavit. He further asserts that the Board provided no other evidence or proof that he purchased his transcript fraudulently or that he knew or had reason to know that he was practicing professional nursing without a valid license. Rather, he argues that the Board's findings and ultimate conclusion were based solely upon its assumption that Ms. Napoleon was correct in stating that he was a participant in her fraudulent scheme, when in fact, the majority of the evidence clearly supported that he had completed all necessary requirements to practice professional nursing. He maintains that the Board's reliance on Ms. Napoleon's affidavit, without further investigation, is cause for reversal.

Pursuant to the West Virginia Code of State Rules § 19-3-12.1, the Board bears the burden of proving the allegations contained in its complaint by a preponderance of the evidence before it can revoke any professional nursing license. To determine whether the Board's revocation of Mr. Bonsu's RN license was proper, we must first determine whether the Board established, by a preponderance of the evidence, that Mr. Bonsu fraudulently purchased his ADN from Palm Beach School of Nursing. As the Supreme Court of Appeals of West Virginia has stated, "the party who has the burden of proof must produce evidence tending to show the truth of such facts that is more convincing ... as worthy of belief, than that which is offered in opposition." *Frazier v. Gaither*, 248 W. Va. 420, 425, 888 S.E.2d 920, 925 (2023).

7

Here, the Board acknowledged that it conducted no independent investigation regarding Mr. Bonsu's professional nursing license and relied solely on the FBI's investigation of the subject nursing schools. Ms. Napoleon's affidavit was heavily relied on by the Board in determining that Mr. Bonsu fraudulently purchased his ADN even though the FBI's letters to the NCSBN strongly encouraged nursing boards to do their own independent investigations into individuals listed in the affidavit.

The need for independent investigations of individuals listed in Ms. Napoleon's affidavit is highlighted in the case of a Delaware nurse who became the subject of a similar situation due to Ms. Napoleon's affidavit. In the Delaware case, the nurse had previously applied to one of the subject nursing schools owned by Ms. Napoleon but ultimately opted to attend a completely different nursing school. Nonetheless, Ms. Napoleon listed the nurse in her affidavit as an individual who had fraudulently purchased an ADN from one of the subject schools. Because Ms. Napoleon's affidavit was incorrect as it pertained to the nurse even attending one of her schools, let alone graduating from it, the Delaware Board of Nursing outlined that it "disregarded the [Napoleon Affidavit,] but found multiple examples of [the nurse] failing to be forthright and noted that his transcript ... was rife with inconsistencies." *Agbemehia v. Delaware Bd. of Nursing*, No. K23A-04-001 RLG, 2024 WL 66047, at *3 (Del. Super. Ct. Jan. 5, 2024). Although Ms. Napoleon's affidavit incorrectly listed the nurse as an individual who received an illegitimate degree, diploma, or transcript from one of her schools, the affidavit caused the Delaware Board of Nursing to investigate the nurse's credentials, finding that the nurse had been previously disciplined by the Pennsylvania Board of Nursing, had falsified entries on a patient's record, had clear deficiencies in his academic record, had previously omitted information on his licensure application, and had a history of fraudulent behavior as a licensed nurse in Pennsylvania. Thus, the Delaware Superior Court upheld the Delaware Board of Nursing's ruling annulling the nurse's license, but not based on Ms. Napoleon's affidavit, as it was incorrect as it pertained to the nurse.

In the present case, after a review of the hearing below, the Board clearly erred in determining that Mr. Bonsu committed fraud in securing his license as it was unsupported by the evidence present in the record. The Board acknowledged through testimony that it determined that Mr. Bonsu committed fraud by simply relying on Ms. "Napoleon's word" because "[s]he swore to it in court. . . [s]he provided an affidavit. . . and [s]he was investigated by the FBI[.]" Simply put, the Board introduced no other evidence to meet its burden that Mr. Bonsu committed fraud other than Ms. Napoleon's affidavit. Thus, we conclude that the Board's finding that it proved by a preponderance of the evidence that Mr. Bonsu "fraudulently obtained a transcript and a degree from a diploma mill" by purchasing his degree instead of earning it was clearly wrong in view of the reliable, probative, and substantial evidence on the whole record. As such, we reverse the Board's determination that Mr. Bonsu was "guilty of fraud or deceit in procuring or attempting to procure a license to practice professional nursing" by "knowingly providing false information regarding completion of [his] educational program[.]"

8

Additionally, we conclude that the Board's determination that Mr. Bonsu "[knew] or ha[d] reason to know that he . . . [was] not licensed, qualified, or competent to perform" professional nursing and thus "engaged in unethical or unprofessional conduct . . . likely to deceive, defraud or harm the public or any member of the public" was clearly wrong. These findings were based solely on the Board's determination that Mr. Bonsu had committed fraud. No other evidence was introduced that indicated that Mr. Bonsu was aware or had reason to know that his RN license was invalid or that his conduct was unethical until disciplinary proceedings were initiated. The Board rationalized its conclusion by finding that since Mr. Bonsu fraudulently purchased his degree, he obviously knew his RN license was invalid. Simply put, the Board lacked evidence to support these conclusions.

However, based upon Mr. Bonsu's testimony, substantial evidence was produced to indicate that Mr. Bonsu failed to obtain the necessary prerequisites to earn a valid ADN from an accredited school. His testimony revealed that not only did he complete a six-month program in five months, his clinicals were only performed in psychiatric units and nursing homes; yet pediatrics, maternal and newborn health, and medical/surgical units are required courses that one must complete to obtain a valid ADN. The Board's determination that Mr. Bonsu's specific path to completing his degree — which involved transferring his credits from Siena College of Health to Palm Beach School of Nursing and earning a degree from there in approximately a month, without being present — could not have met the educational requirements to earn a valid ADN, was supported by the record. Further, although he testified that he was unaware at the time of submission, Mr. Bonsu did not dispute that the transcript he provided to the Board during his application process was incorrect.

Based on the foregoing, we conclude that the Board erred by finding that it had proven by a preponderance of the evidence that Mr. Bonsu: "was guilty of fraud or deceit in procuring or attempting to procure a license to practice . . . professional nursing" pursuant to West Virginia Code § 30-7-11(a)(1); "performed professional responsibilities that . . . [he] kn[ew] or ha[d] reason to know that [he] . . .[was] not licensed, qualified, or competent to perform" pursuant to West Virginia Code of State Rules § 19-3-12.1.e; "engaged in dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public or any member of the public" pursuant to West Virginia Code of State Rules § 19-3-12.1.o; and "knowingly provided false information regarding [his] completion of [his] educational program" pursuant to West Virginia Code of State Rules § 19-3-12.1.t. As such, we reverse these determinations.

Nonetheless, we find no error and conclude that the Board's determination that it had proven by a preponderance of the evidence that Mr. Bonsu: was "unfit . . . by reason of negligence, habits, or *other causes*" pursuant to West Virginia Code § 30-7-11(a)(3) (emphasis added); was "practicing . . . nursing without a license" pursuant to West Virginia Code § 30-7-11(a)(7); and "provided false information on [his] application, or any other

9

document submitted to the [B]oard for the purpose of licensure" pursuant to West Virginia Code of Regulations § 19-3-12.1.jj, was supported by the record. Thus, we affirm these determinations.

West Virginia Code § 30-7-11(a) grants the Board the authority to revoke Mr. Bonsu's license if any of the violations contained in its complaint are proven. Therefore, the Board's ultimate decision that Mr. Bonsu failed to earn a valid ADN and thus did not meet the requirements to take the NCLEX to become an RN are affirmed.

Accordingly, we affirm, in part, and reverse, in part, the Board's July 7, 2023, final order.

Affirmed, in part, and Reversed, in part.

**ISSUED:** September 4, 2024

**CONCURRED IN BY:**

Chief Judge Thomas E. Scarr
Judge Charles O. Lorensen
Judge Daniel W. Greear